# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Richmond Division

FEMINIST MAJORITY
FOUNDATION,

FEMINISTS UNITED ON
CAMPUS, et al.                                        Civil Action No. 3:17-cv-344
             *Plaintiffs,*

v.

UNIVERSITY OF MARY
WASHINGTON, et al.

             *Defendants.*

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION TO DISMISS COMPLAINT

Defendants University of Mary Washington (University) and President Richard Hurley (President Hurley), by counsel, submit this Brief in Support of their Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs filed a Complaint asserting three Counts. Count One purports to allege a violation of 20 U.S.C. § 1681(a) in Title IX, Count Two purports to allege a claim of retaliation under Title IX, and Count Three attempts to allege an equal protection claim under 42 U.S.C. § 1983. Pursuant to Rule 12(b)(1), however, the Court should (a) dismiss Plaintiffs Feminist Majority Foundation, Feminists United on Campus, Williams and Lehman, as they lack standing to pursue these claims and (b) dismiss Count Three, as it is barred by Eleventh Amendment sovereign immunity.

Each count warrants dismissal under Rule 12(b)(6) as well. ***First***, the entire Complaint is barred by the statutes of limitation applicable to each count. ***Second***, Counts One and Two fail to state claims under Title IX—the facts alleged do not show deliberate indifference or any

retaliatory action by the University.  **Third**, Count Three fails to allege facts that demonstrate a similarly situated group was treated more favorably or that the Defendants acted with personal animus toward Plaintiffs – all indispensable elements of an equal protection claim.  **Fourth**, to the extent Count Three seeks damages against President Hurley, he is entitled to qualified immunity.  **Fifth**, although Plaintiffs seek injunctive relief, they have not alleged facts to show they are entitled to it.   Indeed, the Complaint fails to demonstrate that Plaintiffs are entitled to any relief from Defendants and should be dismissed.

## I.     RELEVANT FACTS ALLEGED IN THE COMPLAINT[1]

Plaintiff Feminists United On Campus (Feminists United) is a "student-run organization at UMW" and an affiliate of Plaintiff Feminist Majority Foundation (Feminist Majority), a nation-wide organization (Id. ¶¶ 10 and 11.)  The University is "a state-funded university receiving federal funds" and Defendant Hurley was President of the University.  (Id. ¶¶ 17-18.)

In November of 2014, Feminists United was "active in a discussion" regarding the student body's vote "on a motion in support of Greek life (i.e., the recognition of fraternities) on campus."  (Id.) At a town hall meeting held after the motion passed, Plaintiffs McKinsey and Musick "asked those in favor of Greek life to address the studies and research that showed that Greek life on campus increased the number of sexual assaults on campus."  (Id. ¶ 20.) Afterward, "students immediately started posting messages on Yik Yak", which is an "anonymous social media app that allows people to create and view messages, i.e., 'Yaks,' within a 1.5 mile radius," about the issue. (Id. ¶ 21.)   The posts were "about the Greek life issue and Feminists United" such as "'this feminist needs to calm the hell down,'" "'these

[1]The facts cited herein are those facts alleged in the Complaint.  Defendants do not admit to the accuracy, completeness, and/or sequence of those alleged facts.

feminists need to chill their tits,'" calling Plaintiff McKinsey "'scary,'" and "'I fucking hate feminists and sour vaginas.'" (Id.)

On November 21, 2014, the University's Title IX coordinator met with Feminists United members (including Plaintiffs Michels and McKinsey) to discuss "the Administration's sexual assault prevention policy . . . and the University's failure to resolve the issue in a prompt manner." (Id. ¶ 22.) The Title IX coordinator "expressed a desire to work with them." (Id.) After this meeting, as "members of Feminists United were walking home, cars drove by and students yelled out "'Fuck the feminists!'" (Id. ¶ 23.)

On November 23, 2014, a University student observed "the men's rugby team perform[] a chant that advocated violence against women, including rape, murder, and necrophilia." (Id. ¶ 24.) In late November 2014, the student provided a copy of a video recording of the rugby team chant's to the University. (Id. ¶ 25.) On December 4, 2014, Feminists United met with President Hurley and the Title IX coordinator, during which President Hurley "stated he was disgusted by the chant and that action was being taken." (Id.)

On January 29, 2015, Plaintiff McKinsey, published an article in the student newspaper paper discussing the threatening Yaks and verbal harassment targeting "the feminists." (Id. ¶¶ 27 and 81.) Plaintiffs claim that the article "led to an escalation of verbal assaults and cyber-attacks on members of Feminists United and others perceived to be feminists." (Id. ¶ 28.)

On February 20, 2015, Plaintiff McKinsey emailed the Title IX coordinator to tell her that the president of the men's rugby team had approached Plaintiff earlier that day to talk with her about her article in the student newspaper. (Id. ¶¶ 30-31.) Plaintiff stated, "They didn't do anything threatening," but she still felt "deeply unsafe" as a result of the encounter and the Yik Yak posts. (Id. ¶ 31.) Plaintiff McKinsey also asked if the University was "still planning on

taking some action," presumably against the rugby team as a result of the chant. (Id.) The Title IX coordinator responded on February 24, 2015, "that she did not know specifically what was happening regarding the rugby team, but that the University was taking action." She also offered to "set up a mediated discussion between the rugby team and Feminists United." (Id. ¶ 32.)

On February 24, 2015, a University professor emailed Plaintiff McKinsey and other Feminist United members stating that the professor offered "to organize three 'listening circles' to allow students to talk about their experiences with Yik Yak and other anonymous posting sites." (Id. ¶ 33.) The listening groups would be comprised of students and University staff and administrators to "'raise awareness (especially among faculty and staff)' about what was happening.'" (Id.)

On March 11, 2015, the University held "an open forum about sexual assault on campus," which President Hurley attended and answered questions about the rugby team chant. (Id. ¶ 35.) According to the allegations in the Complaints, his remarks "made clear to [Plaintiffs] he and other [University] administrators did not understand their legal obligations under Title IX to maintain a campus environment free of sexual harassment and threats of violence." (Id.)

In a meeting between Feminists United members and the Title IX coordinator on March 12, 2015, Feminists United asked "for an update about the rugby team." (Id. ¶ 36.) The Title IX coordinator "informed the group that while a sanction had been issued, the rugby team had appealed the sanction." (Id.)

On March 17, 2015, Plaintiff Michels emailed President Hurley, informing him that "Feminists United had decided to release the transcription of the chant to [University's] student

paper" because the University had "failed to act in response to the chant." (Id. ¶ 37.) President Hurley responded to Plaintiff Michels that day and advised "that a hearing was held, sanctions were determined, and an appeal was filed and heard the day before. He noted that a final decision would be made within two days." (Id. ¶ 38.) He also stated that he took her safety concerns "quite seriously." (Id.)

President Hurley sent an email to the student body on March 18, 2015, "discussing [the University's] efforts to end 'sexual assault, violence against women, and other forms of discrimination and harassment that prevail in our society.'" (Id. ¶ 40.) Later that evening, President Hurley met again with Plaintiffs McKinsey Musick, Michels and other Feminists United members regarding the rugby team chant. (Id.)

On March 19, 2015, a University alumna "posted a transcription of the rugby team chant on the Facebook page 'Overheard – UMW.'" (Id. ¶ 42.) Later that day, President Hurley sent an email to the student body stating that the rugby team chant contained "sexually explicit, derogatory, and violent language" and "that all rugby activities had been suspended indefinitely" and that "each member of the rugby team was required to participate in training regarding sexual assault and violence." (Id.)

After President Hurley's email, the Complaint alleges that "there was an explosion of posts on Yik Yak, with sexist comments and threats directed at Feminists United, which was being blamed by many for the situation." (Id. ¶ 44.) Plaintiffs contend that "[a]t least three students identified with Feminists United were mentioned by name in the Yaks: Plaintiff Paige McKinsey, Plaintiff Kelli Musick, and Grace Mann." (Id.) The Yik Yak posts allegedly "included physical and sexual threats," and "identified Plaintiff McKinsey's locations." (Id.) Some of the threatening Yaks posted included: "'Gonna tie these feminists to the radiator and

[g]rape them in the mouth; Dandy's about to kill a bitch . . . or two; and Can we euthanize whoever caused this bullshit?'" (Id. ¶ 45.) Feminists United was "referred to in various posts as femicunts, feminazis, cunts, bitches, hoes, and dikes." (Id.) The Complaint alleges that Plaintiff McKinsey "was called out by name in numerous posts, including reporting her whereabouts on campus so that posters could 'call her out in person.'" (Id. ¶ 46.)

On March 24, 2015, Plaintiff McKinsey planned to attend a Young Democrat's meeting. (Id. ¶ 47.) A poster to Yik Yak suggested that students "confront her there," which Plaintiff McKinsey alleges "made her extremely uncomfortable." (Id. ¶ 47.) Plaintiff McKinsey notified campus police that "she felt unsafe as a result of the post"; campus police "sent a police officer to attend both the Feminists United and Young Democrats meetings held that night." (Id.)

On March 26, 2015, Plaintiffs McKinsey, Williams and Michels met with the Title IX coordinator and other University officials "to discuss the Yik Yak threats and the students' increasing fear for their personal safety." Among the students' requests in that meeting was that the University "[c]ontact Yik Yak to have the app disabled for their location (which is made possible because of its geographic function), ban Yik Yak from Apogee, UMW's Wi-Fi (forcing students who wanted to continue accessing the app to use their own internet access), to [c]larify exactly what happened with the rugby situation and explain that Feminists United had no role in the University's decision." (Id. ¶ 49.)

On March 27, 2015, the Title IX coordinator emailed the student body stating that she "had received questions from students regarding how to handle abusive or threatening comments on social media, which she referred to as 'a serious matter.'" (Id. ¶ 50.) The Complaint alleges that she also stated that "the university has no recourse" for anonymous comments made on

social media and should students find themselves "the subject of an abusive or threatening comment on social media please immediately file a report so that the site can take administrative action." (Id.) Shortly thereafter, a University official spoke to Plaintiff Michels and "explained that the University was considering holding some sort of assembly." (Id. ¶ 54.) He also stated the University's legal counsel advised the University that it "could not consider disabling Yik Yak on campus because of concerns about the First Amendment." (Id.)

On March 30, 2015, a member of Feminists United emailed President Hurley and the Title IX coordinator expressing a "concern" that "the University was in violation of Title IX." (Comp. ¶ 55.) And on March 31, 2015, President Hurley attended the Feminists United rally "End Campus Rape" to hear Plaintiff McKinsey speak. (Id. ¶ 56.)

On April 1, 2015, Plaintiff McKinsey emailed President Hurley regarding Feminists United's request "that the Administration ban Yik Yak on the University Wi-Fi." (Id. ¶ 58.) President Hurley responded the same day stating that the "'Yik Yak question is complicated'":

> On the one hand, UMW is an arm of the government because we are a taxpayer supported institution and thus bound by the First Amendment (Freedom of Speech) but, on the other hand, I certainly understand concerns about threats and feelings of safety on campus. I have, however, cut and pasted a comment from a well-known activist group below to help answer the questions asked yesterday about why private colleges can remove YikYak and we can't. FIRE's comment underscores what I mean when I said that I would have to be careful in taking an action that stifle's free speech. I will get back to you with more information later.

(Id. ¶ 58.) That same day, the Title IX coordinator expressed the same First Amendment concerns to a member of Feminists United. (Id. ¶ 59.) The Complaint alleges that:

> Once again, [the Title IX coordinator] made clear that UMW was unwilling to protect Plaintiffs from the online sexual harassment, sex-based bullying, and threats they had been experiencing, despite being put on notice repeatedly that the online harassment was creating a sexually hostile campus environment, which in turn interfered with their

educational pursuits.

(Id.)

On April 8 and 15, 2015, Plaintiffs McKinsey, Michels and others met with University officials at a 'sharing circle' to discuss "the offensive and threatening Yaks" and possible solutions. (Id. ¶¶ 62-63.)

On May 7, 2015, Plaintiffs filed an administrative complaint with the Department of Education's Office of Civil Rights (OCR Complaint). (Id. ¶ 67.) The next day, they "held a press conference at [the University] to announce the filing of the OCR Complaint." (Id.) Also, on May 8, 2015, the University "issued a public statement denying the allegations in the OCR complaint." (Id. ¶ 68.) The Complaint alleges that "[f]or many days after the press conference, anonymous posts appeared on Yik Yak that made disparaging statements about Plaintiffs." (Id. ¶ 69.)

On June 8, 2015, President Hurley sent a letter to the Feminist Majority (June 8 Letter) that the Complaint alleges "falsely asserted that the initial OCR Complaint drew a 'troubling' connection between Ms. Mann's death and the Yik Yak threats despite Feminists United's and its counsel's public statements to the contrary." (Id. ¶¶ 70-71.) According to the Complaint, the June 8 Letter also "falsely stated that neither the University nor Campus Police ever received any reports from Ms. Mann (or other member of Feminists United) that she was being targeted by Yik Yak threats." The June 8 Letter also "erroneously claimed that Plaintiff McKinsey was the only individual named in the Yik Yak posts." (Id. ¶ 72.) Plaintiffs claim that "[i]n response to Defendant Hurley's letter" "Plaintiffs were subjected to harassing, hostile, and threatening Yaks and other social media posts throughout the summer of 2015." (Id. ¶ 73-74.) Plaintiffs seek injunctive relief, compensatory damages, attorneys' fees, litigation expenses and costs.

# II.    STANDARDS OF REVIEW

## A.    RULE 12(B)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure "permits a party to move to dismiss an action for lack of subject matter jurisdiction." *Allen v. College of William & Mary*, 245 F. Supp. 2d 777, 782 (E.D. Va. 2003).  The burden of proving subject matter jurisdiction rests upon the plaintiff.  *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  Thus, a court may dismiss a complaint which fails to allege facts to demonstrate subject matter jurisdiction. *Id.* at 1219.

## B.    RULE 12(B)(6)

"The function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint."  *Allen*, 245 F. Supp. 2d at 783.  Considering the allegations in the Complaint in the light most favorable to the non-moving party, a court must grant a motion to dismiss if the plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  " [A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.   A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  What is more, the Court is allowed to impose on the analysis its "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, at 679 (2009) (citing case omitted).

# III.    ARGUMENT

## A.    THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(1) AS TO PLAINTIFFS FEMINIST MAJORITY FOUNDATION, FEMINISTS UNITED, WILLIAMS AND LEHMAN BECAUSE THEY LACK STANDING

A plaintiff has the burden of establishing standing to sue. *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 268 (4th Cir. 2011). That is, a plaintiff must show, among other factors, that it has "suffered an injury in fact." *Virginia ex rel. Cuccinelli*, 656 F.3d at 268 (quoted case omitted) (internal quotations omitted). Where a plaintiff fails to do so, a federal court lacks the power to hear and determine the merits of the suit. *Id.* Here, neither Plaintiffs Feminist Majority, Feminists United, Williams nor Lehman has met that burden.

**1.     The organizational Plaintiffs lack standing.**

As this Court has held, "[a]n organizational plaintiff may establish standing to bring suit on its own behalf when it seeks redress for a distinct injury suffered by the organization itself." *Heap v. Carter*, 112 F. Supp. 3d 402, 415 (E.D. Va. 2015) (citing *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005)). The organization must allege sufficient facts to demonstrate that it has suffered a cognizable injury. *Heap*, 112 F. Supp. 3d at 415. Neither Feminist Majority nor Feminists United alleges any facts that demonstrate that they suffered a distinct injury as a result of the University's or President Hurley's alleged conduct. Accordingly, both lack standing to bring this suit on their own behalves and both should be dismissed. *Id.* (dismissing organizational plaintiff where it failed to allege an injury).

Neither can either organization bring this matter on behalf of its members. An association only has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right and (2) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). There are no facts alleged in the Complaint that demonstrate that any of Feminist Majority's members were students at the University or that they suffered the harassment alleged in the Complaint. Rather, the Complaint alleges only that Feminists United is an ***affiliate*** of Feminist Majority. (Compl. ¶

10.)  Thus, there are no allegations in the Complaint that establish that any of Feminist Majority's members suffered an injury-in-fact or have standing to sue.  Consequently, Feminist Majority cannot sue on behalf of its members and should be dismissed.  *See Heap*, 112 F. Supp. 3d at 419 (dismissing organizational plaintiff for lack of associational standing where the complaint did not establish that any of its members had standing to sue).

Feminists United fares no better.  The allegations in the Complaint establish that the Title IX and the equal protection claims are premised on conduct allegedly suffered by individual student members, these claims require those individual members to participate in the suit.  Indeed, individual members of Feminists United ***are already plaintiffs in the lawsuit***.  (Compl. ¶¶ 12-16.)  They are, therefore, required to participate in the lawsuit and the determination of any requested relief.  As such, Feminists United also lacks associational standing to being these claims on behalf of its members and should be dismissed.

### 2.    Plaintiffs Williams and Lehman have not alleged an injury-in-fact.

There are no allegations in the Complaint that demonstrate Plaintiffs Williams and Lehman suffered an injury-in-fact from the conduct alleged therein.  The United States Supreme Court has held that "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, *as revised* (May 24, 2016) (quoted case omitted).  The injury "'must affect the plaintiff in a personal and individual way.'"  *Id*. (quoted case omitted.)  Plaintiffs Williams and Lehman do not allege a particularized injury personalized to them in an individual way.  Thus, the Complaint must be dismissed as to those Plaintiffs.  *See Virginia ex rel. Cuccinelli*, 656 F.3d at 272 (dismissing claim based Virginia's lack of injury-in-fact).

**B.** **THE COURT SHOULD DISMISS COUNT THREE PURSUANT TO RULE 12(B)(1) BECAUSE IT IS BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY**

Plaintiffs attempt to assert an equal protection claim under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against the University and President Hurley in his official capacity. (Compl. ¶¶ 101-106.) That claim fails as a matter of law under Eleventh Amendment sovereign immunity.

The University is a governmental entity.  It is a public institution of higher learning established and funded by the State.  *See* Va. Code §§ 23.1-1800-1803; 1977-78 Op. Va. Atty. Gen. 65, 1978 Va. AG LEXIS 164 (opining that the University acts in a "statewide capacity as an agency of the Commonwealth") (attached as Exhibit A); (Compl. ¶ 17).  Therefore, as an "arm" of the Commonwealth, it is immune from § 1983 suits.  *See Kelly v. Maryland*, 267 F. App'x. 209, 210 (4th Cir. 2008) (stating "[i]t is now well settled that a state cannot be sued under § 1983. . . This rule applies to . . . governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes.") (quoted case omitted).  Furthermore, neither are officials acting in their official capacities subject to § 1983 suits under the doctrine of sovereign immunity.  *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70-71 (1989) (stating "[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983.")).  Thus, to the extent Count Three purports to bring a claim under § 1983 against the University or President Hurley in his official capacity, it is barred by Eleventh Amendment sovereign immunity and must be dismissed.

**C.** **THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(6) BECAUSE IT IS BARRED BY THE STATUTE OF LIMITATIONS**

Plaintiffs filed this action on May 4, 2017.  According to the allegations in the Complaint, Plaintiffs' causes of action in Counts One and Three accrued as early as March 11, 2015 and as

late as April 1, 2015; those claims are time-barred. Further, most if not all of the alleged conduct on which Count Two is premised is also time-barred by the applicable statutes of limitation.

1.      **The causes of action in Counts One and Three accrued on or before April 1, 2015.**

A civil rights claim "accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Abeles v. Metro. Wash. Airports Auth.*, No. 1:15-cv-00792, 2016 U.S. Dist. LEXIS 45747, at *11 (E.D. Va. Apr. 1, 2016) (internal quotations omitted). In other words, "a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice - e.g., by the knowledge of the fact of injury and who caused it - to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Nasim v. Warden*, 64 F.3d 951, 955 (4th Cir. 1995).

Plaintiffs' Title IX and equal protection claims accrued no later than April 1, 2015 – but likely sooner. Plaintiffs knew or reasonably should have known of their claims at least as early as March 11, 2015. Plaintiffs admit that as of March 11, 2015, it was clear to them that the University "did not understand their legal obligations under Title IX." (Compl. ¶ 35.) On March 26, 2015, Plaintiffs presented the University with a list of demands, which included that the University request that the developers of Yik Yak disable it for the University's geographic location, that the University ban the application from the University's wireless internet and inform the student body that Feminists United had no role in the University's decision to sanction the rugby team. (Id. ¶ 49.) As of March 27, 2015, however, it was clear that the University would not take the requested actions. According to the Complaint, on that date, the University sent an email to the student body advising that the University could not control offensive comments on social media and encouraged students to reach out to Yik Yak directly if a student experienced offensive comments via the application. (Id. ¶ 50.) On March 30, 2015, a

member of Feminists United sent an email asserting that the University was in breach of Title IX. (Id. ¶ 55.) Plaintiffs further allege that President Hurley's remarks on April 1, 2015 made it clear to Plaintiffs that the University "was unwilling to protect Plaintiffs from the online sexual harassment, sex-based bullying, and threats" that were "creating a sexually hostile campus environment, which in turn interfered with their educational pursuits." (Id. ¶ 59.) Thus, as early as March 11, 2015 and as late as April 1, 2015, Plaintiffs had sufficient "knowledge of the fact of injury and who caused it - to make reasonable inquiry and that inquiry" would've "revealed the existence of a colorable claim." *Nasim*, 64 F.3d at 955.

### 2. The Virginia Human Rights Act's 300-day statute of limitations bars the Plaintiffs' Title IX claims in Counts One and Two.

Title IX does not contain its own statute of limitations. Congress often enacts legislation without including a controlling statute of limitations. *See Simpson v. Va.*, No. 1:16-cv-162, 2016 U.S. Dist. LEXIS 95579, at *20 (E.D. Va. July 21, 2016). When this omission occurs in civil rights legislation, 42 U.S.C. § 1988(a) "provides for the selection of an appropriate common-law statute of limitations, which is most applicable to the federal action." *Id.* (quoting *Wolsky v. Med. Coll. of Hampton Rds.*, 1 F.3d 222, 223 (4th Cir. 1993)).

The Supreme Court of the United States, in *Wilson v. Garcia*, held that in determining which limitations period to borrow from State law, it is uniformity within the State, not within a federal circuit, that is critical. *Wilson v. Garcia,* 471 U.S. 261, 273-75 (1985). Thus, the Fourth Circuit uses a two-prong analysis to determine which State statute of limitations applies to federal claims. *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir. 1994). First, the court selects the State statute most analogous to the federal statute at issue. *Id.* Second, it "consider[s] whether application of that limitations period is consistent with the federal statute and its underlying policies." *Id.*

Applying this analysis, the Fourth Circuit closely analyzes a forum State's laws to determine which State statute is most analogous to the federal claim at issue. *See, e.g.*, *Wolsky*, 1 F.3d at 223-224; *McCullough*, 35 F.3d at 129-130. In fact, the Fourth Circuit has a history of breaking with the majority opinion when applying State statutes of limitations to federal civil rights claims. In *Wolsky*, for example, the Fourth Circuit declined to follow the lead of other circuit courts to apply a personal injury statute of limitations to claims pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Rehabilitation Act). *Wolsky*, 1 F.3d at 225. Instead, it held that the Virginia Rights for Persons with Disabilities Act, or Virginia Code § 51.5-40, *et seq.*, was the most analogous State statute to a federal claim pursuant to the Rehabilitation Act. And therefore, its one-year statute of limitations, not Virginia's two-year statute of limitations for personal injury actions, applied to the claim. *Id.* In reaching this conclusion, the Fourth Circuit stated, "[g]iven that the Virginia [Rights for Persons with Disabilities] Act is modeled after the Rehabilitation Act, we break with the conclusions of the other circuits to apply a personal injury statute of limitations [to Rehabilitation Act claims]." *Id.*; *McCullough*, 35 F.3d at 130 (stating that "state personal injury statutes are not always the most analogous to Rehabilitation Act cases.") (citing *Wolsky*, 1 F.3d at 224).

The Fourth Circuit has yet to perform an analysis of Virginia law with respect to Title IX claims and the most appropriate statute of limitations. In an unpublished decision, however, the Fourth Circuit declined to apply South Carolina's personal injury statute of limitations to a Title IX claim. *See Moore v. Greenwood School District No. 52*, 195 F. App'x 140, 143 (4th Cir. 2006). In *Moore*, the Fourth Circuit upheld the South Carolina district court's decision to apply the South Carolina Human Affairs Law's one-year statute of limitations to a plaintiff's Title IX claim. *Moore*, 195 F. App'x at 143. The Fourth Circuit followed the principles set forth in

*Wolsky* and *McCullough* and determined that South Carolina's Human Affairs law was most analogous to Title IX. In so doing, it applied the South Carolina Human Affairs Law's one-year statute of limitations to the plaintiff's Title IX claim instead of South Carolina's two-year personal injury statute of limitations. *Id.*

The Virginia Human Rights Act, Virginia Code § 2.2-3900, *et seq.* (VHRA) is analogous to South Carolina's Human Affairs law. The VHRA broadly prohibits discriminatory practices in the Commonwealth of Virginia:

> It is the policy of the Commonwealth to: (1) Safeguard all individuals within the Commonwealth from unlawful discrimination because of race, color, religion, national origin, ***sex***, pregnancy, childbirth or related medical conditions, age, marital status, or disability, in places of public accommodation, including ***educational institutions*** and in real estate transactions; in employment; preserve the public safety, health and general welfare; and further the interests, rights and privileges of individuals within the Commonwealth; and (2) Protect citizens of the Commonwealth against unfounded charges of unlawful discrimination.

Va. Code § 2.2-3900(B) (emphasis added). The VHRA contains a 300-day statute of limitations. *See* Va. Code § 2.2-3903(C).[2] This Court's sister jurisdiction noted that the VHRA "essentially makes any federal violation a violation of Virginia law as well." *Grimes v. Canadian Am. Transp.*, 72 F. Supp. 2d 629, 634 (W.D. Va. 1999) (stating that "by setting forth facts that would establish a possible Title VII claim, she [Plaintiff] has also set forth facts which indicate a possible violation of the VHRA").

Congress enacted Title IX to prohibit discrimination on the basis of gender at any educational institution receiving federal funds. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

---

[2] The VHRA creates a cause of action in certain instances of wrongful discharge based on discrimination and places a 300-day limitations period to bring suit. Although this limitations period is related to the employment context, courts frequently borrow from Title VII jurisprudence when addressing Title IX claims, *see, e.g.*, *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 733 (E.D. Va. 2015). This limitations period should apply to Title IX claims because it is the ***most analogous*** statute.

274, 280-81 (1998). Title IX states, "No person in the United States shall, on the basis of *sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). Similarly, VHRA's purpose is to protect against discrimination based on sex "in places of public accommodation, including educational institutions." Va. Code § 2.2-3900(B). This purpose and the text of the statute closely align with the purpose and language of Title IX. Consequently, the VHRA is more analogous to Title IX than Virginia's common law personal injury action. Here, Plaintiffs allege they were subject to discrimination and retaliation by an educational institution due to their gender and their injuries were the denial of "access to a safe and secure educational environment in violation of Title IX." (Compl. ¶ 100.) This type of claim most closely aligns with a violation of the VHRA. Thus, the 300-day statute of limitations in the VHRA applies to the Plaintiffs' Title IX claims.

Having filed Counts One and Two on May 4, 2017, Plaintiffs cannot recover for any conduct alleged to have occurred prior July 8, 2016, which is 300 days before May 4, 2017. Since all of the conduct alleged in those counts took place prior to July 8, 2016, Counts One and Two are barred by the statute of limitation in their entireties.

**3.      In the alternative, Virginia's two-year personal injury statute of limitations bars Plaintiffs' Title IX claim in Count One in its entirety and most of Count Two.**

Should this Court determine that the VHRA's 300-day statute of limitations is inapplicable to the Title IX claims, then the next most analogous cause of action under Virginia law is a personal injury action. Under Virginia law, the statute of limitations for a personal injury claim is two years. *See* Va. Code § 8.01-243(A). But even applying the longer limitations period for personal injury actions, Plaintiffs' claim in Count One is still time-barred in its entirety. Plaintiffs should have filed that claim by April 1, 2017, at the latest. They did not, As

to Count Two, since Plaintiffs allege ongoing conduct, any conduct that is alleged to be retaliatory that occurred prior to May 4, 2015—two years before they filed this suit—is also time barred.

**4.    A two-year statute of limitations bars Plaintiffs' equal protection claim in Count Three.**

With regard to the § 1983 and the equal protection claims, the statute of limitations period for both is two years. *Lewis v. Richmond City Police Dept*., 947 F.2d 733, 735 (4th Cir. 1991) (applying two-year statute of limitation to § 1983 claims); *Al-Amin v. Shear*, 325 F. App'x 190, 193 n.2 (4th Cir. 2009) (applying two-year statute of limitations to equal protection claim). As  argued above, Plaintiffs' § 1983 and equal protection claims accrued no later than April 1, 2015, requiring them to file their claims by April 1, 2017.  They did not.  Plaintiffs' claim under Count Three is time barred, and the Court should dismiss it.

**D.    COUNT ONE ALSO FAILS TO STATE A TITLE IX CLAIM UNDER RULE 12(B)(6)**

The allegations in the Complaint do not sufficiently and plausibly demonstrate deliberate indifference by the University.  One of the crucial elements of a hostile educational environment claim under Title IX requires a plaintiff to demonstrate that the educational institution had actual knowledge of the harassment but was deliberately indifferent to it.  *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

The Supreme Court of the United States has stated that deliberate indifference is a "high standard."  *Davis*, 526 U.S. at 643.  Specifically, "[a]n institution will be deemed deliberately indifferent to third-party harassment 'only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'"  *Rouse v. Duke Univ.*, 914 F. Supp. 2d 717, 723-24 (M.D.N.C. 2012) (quoting *Davis, supra*, 526 U.S. at 648).  Therefore, to comply with Title IX, an institution "must merely respond to known . . . harassment in a manner

that is not clearly unreasonable." *Davis*, 526 U.S. at 649. Because this standard is so high, it "precludes a finding of deliberate indifference *in all but limited circumstances*." *Doe v. Bd. of Educ. of Prince George's Cty*, 982 F. Supp. 2d 641, 654 (D. Md. 2013) (citing *Davis*, 526 U.S. at 643) (internal quotations omitted and emphasis added), *aff'd*, 605 F. App'x 159 (4th Cir. 2015). In fact, "[i]n an appropriate case, there is no reason why courts, *on a motion to dismiss* . . . could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649 (emphasis added).

Deliberate indifference, however, "is not a mere 'reasonableness' standard." *Davis*, 526 U.S. at 649. In fact, "[a] showing of simple or even heightened negligence will not suffice" to demonstrate deliberate indifference. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997); *Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 636-37 (W.D. Va. 2016) (stating that "mere negligence is insufficient"). Thus, the Fourth Circuit has declined to employ a negligence standard in assessing deliberate indifference. *See Doe v. Bd. of Educ.*, 605 F. App'x 159, 168 (4th Cir. 2015) (declining to do so in the context of Title IX). Deliberate indifference occurs when an institution "refuses to take action" and makes "an official decision . . . not to remedy" harassment. *Gebser*, 524 U.S. at 290; *Doe*, 605 F. App'x at 168.

Plaintiffs fail to allege sufficiently and plausibly that the University was deliberately indifferent to Plaintiffs' reports of sexual harassment. Instead, the allegations in the Complaint show that University took action. And that action was not clearly unreasonable. For example,

- On November 21, 2014, members of Feminists United, including Plaintiffs Michels and McKinsey and others, met with the University's Title IX coordinator to share the students' concerns with the University's provision of sexual assault services on campus. (Compl. ¶ 22.)

- On December 4, 2014, members of Feminists United met with President Hurley and the Title IX coordinator regarding the rugby team's chant and sexual assault issues on campus.  (Id. ¶ 26.)

- On February 24, 2015, the Title IX coordinator offered to Plaintiff McKinsey to set up a "mediated discussion" between the Plaintiffs and the rugby team.  (Id. ¶ 32.)

- On March 11, 2015, the University held an open forum about sexual assault on campus. (Id. ¶ 35.)

- On March 12, 2015, three Feminists United members met with the Title IX coordinator and were informed that the team was sanctioned.  (Id. ¶ 36.)

- On March 17, 2015, President Hurley provided to Plaintiff Michels' email with an update on the University's handling of the rugby team chant.  (Id. ¶ 38.)

- On March 18, 2015, President Hurley emailed and met with Plaintiffs McKinsey, Musick, Michels and others regarding the University's handling of the rugby team.

- On March 19, 2015, President Hurley sent an email to the student body stating that the rugby team had been suspended indefinitely and each team member was required to go to sexual assault training. (Id. ¶ 43.)

- On March 24, 2015, campus police were dispatched to attend Young Democrats and Feminists United meetings after Plaintiff McKinsey informs them that she felt unsafe as a result of Yik Yak comments.  (Id. ¶ 47.)

- On March 26, 2015, various Plaintiffs met with the Title IX coordinator and other University administrators to discuss the Yik Yak comments.  (Id. ¶ 49.)

- On March 27, 2015, the Title IX coordinator sent an email to the entire student body, recognizing students' concerns about anonymous comments being made on social

media such as Yik Yak and referring to offensive comments as a "serious matter." She advised students to reach out to the social media sites to lodge complaints if they experience abusive or threatening comments. (Id. ¶ 50.)

- On April 8, 2015, University officials held a "sharing circle," in which Plaintiffs McKinsey and Michels participated, to discuss student concerns about Yik Yak. (Id. ¶ 62.)

- On April 15, 2015, University officials held a second "sharing circle" to develop proposals to address the anonymous comments being made on Yik Yak. (Id. ¶ 63.)

Plaintiffs may disagree with a particular action taken by the University in response to their complaints and the precise manner and timing of that action, but that there was responsible and thoughtful action is clear. Further, that the University did not always take the specific action Plaintiffs desired is irrelevant. Plaintiffs are not entitled to a particular remedy or outcome under Title IX. *See Doe*, 982 F. Supp. 2d at 657-58 (observing that a plaintiff does not have the "right to make particular remedial demands" in the context of Title IX) (citing *Davis,* 526 U.S. at 648). Even by the Plaintiffs' own statements of fact, the University and President Hurley took reasonable steps to address Plaintiffs' concerns regarding anonymous harassers; their responses were not deliberately indifferent as a matter of law. *See, e.g., Rouse v. Duke Univ.*, 914 F. Supp. 2d 717, 724 n.2 (M.D.N.C. 2012) (stating "[B]ecause the 'deliberate indifference' test incorporates a 'clearly unreasonable in light of the known circumstances' requirement, it is inherently more difficult for a plaintiff to satisfy when the educational institution has relatively little to no control over the harasser or the context in which the harassment takes place.").

In fact, federal courts have found no deliberate indifference in Title IX cases when the institutional responses paled in comparison to the University's response here. *See, e.g.*,

*Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003) (finding **no deliberate indifference** when an institution, in response to a sexual assault, relied upon the fraternity system to investigate it and, in so doing, imposed no sanctions on the fraternity); *DeCecco v. Univ. of S.C.*, 918 F. Supp. 2d 471, 494-95 (D.S.C. 2013) (finding **no deliberate indifference** when, in response to a report of sexual harassment, an institution merely invited the plaintiff to file a formal complaint); *KF v. Monroe Woodbury Cent. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) (finding **no deliberate indifference** when an institution responded to a report of sexual harassment only by meeting with the accuser's parents, providing them with alternatives to the school in which the harassment occurred, and explaining that they were entitled to file a grievance under the Title IX procedures if they felt it was appropriate); *Ross v. Univ. of Tulsa*, 180 F. Supp. 3d 951, 968-69 (N.D. Okla., 2016) (finding **no deliberate indifference** when an institution, in dealing with a sexual assault victim who was unwilling to move forward, only contacted the victim and took her statement). Here, University officials met with Plaintiffs, investigated and sanctioned the rugby team, sent campus-wide emails, advised the student body on how to address anonymous comments made on social media sites, hosted multiple listening circles intended to educate the campus community about the harm caused by anonymous offensive comments on-line, and provided information and resources to Plaintiffs. In sum, the University's clearly reasonable actions far exceeded those above, all of which were found to be lawful under Title IX.

E.     COUNT TWO FAILS UNDER RULE 12(B)(6)BECAUSE PLAINTIFFS DO NOT MAKE A *PRIMA FACIE* SHOWING OF TITLE IX RETALIATION

Title IX does not elaborate on what is necessary to satisfy a Title IX retaliation claim. The Fourth Circuit clarified, however, that "Title VII, and the judicial interpretations of it, provides a persuasive body of standards to which we may look in shaping the contours of a

private right of action under Title IX." *Preston v. Va. ex. rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994). As a result, "[i]n order to establish a *prima facie* case of retaliation, [the plaintiff] must prove three elements: first, that the plaintiff engaged in protected activity; second, that an adverse … action was taken against the plaintiff; and third, that there was a causal link between the protected activity and the adverse … action." *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004); *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 828 (E.D. Va. 2016) (requiring that in the Title VII context the adverse action be "materially" adverse.).

Plaintiffs fail to plead any facts that demonstrate a materially adverse action taken *by the University*. Plaintiffs allege that the June 8 Letter was "direct retaliatory conduct." (Compl. ¶ 99.) It was not—as a matter of law. There is no allegation that the letter imposed any "action" against Plaintiffs. It was not sent to or directed at the student Plaintiffs. There is no allegation that it advocated adverse action against Plaintiffs. There are no allegations that any University official took any action against the Plaintiffs as a result of the letter or the filing of the OCR Complaint. Rather, it is apparent from the allegations in the Complaint that the June 8 Letter was the University's official public statement in response to (a) Plaintiffs' OCR Complaint, which accused the University of violating Title IX and (b) Plaintiffs' related press conference that was covered by multiple media outlets. (Id. ¶¶ 67-68.) Plaintiffs' chief criticism of the June 8 Letter appears to be that it dared to contradict allegations in the Plaintiffs' OCR Complaint and that it "suggested"—not stated—but "suggested Plaintiffs' concerns were exaggerated and baseless." (Id. ¶ 72). Even if that characterization is true, that the University disagreed with Plaintiffs' perspective, it does not constitute an "adverse action" and it will not support a retaliation claim under Title IX.

Further, to the extent Plaintiffs allege that the University is legally liable for alleged retaliatory harassment by the anonymous posters, that claim fails as well. Plaintiffs do not allege that any of these posts were made by or at the behest of University employees. (*See* id. ¶¶ 73-74.) Indeed, these were posted by anonymous third parties over whom the University had no knowledge or control and cannot be deemed the action of the University. Therefore, the Court should dismiss the Title IX retaliation claim against the University.

## F. COUNT THREE FAILS TO STATE AN EQUAL PROTECTION CLAIM UNDER RULE 12(B)(6)

To allege a § 1983 claim, a plaintiff must first allege that he has been deprived "of a right secured by the Constitution and laws of the United States." *Philips v. Pitt County Mem'l Hosp*., 572 F.3d 176, 180 (4th Cir. 2009). Where there is no deprivation or violation of a federal right "'there is no basis for a claim under § 1983.'" *Kalan v. Health Ctr. Comm'n of Orange County, Virginia*, 198 F. Supp. 3d 636, 641 (W.D. Va. 2016) (quoted case omitted).

"In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity In Athletics, Inc.*, 639 F.3d at 108 (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In the equal protection context, "similarly situated" means that the individuals "are in all relevant respects alike." *Stevens v. Holder*, 966 F. Supp. 2d 622, 641 (E.D. Va. 2013) (quoting *Veney v. Wyche,* 293 F.3d 726, 730–31 (4th Cir.2002) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)).

### 1. Plaintiffs do not allege facts sufficient to meet the "similarly situated" requirement.

Plaintiffs have failed to plead any facts that demonstrate that they were treated differently from ***similarly situated persons***. Instead, Plaintiffs offer vague and general allegations such as

Defendants "treated Plaintiffs differently from male students at the University of Mary Washington." (Compl. ¶ 103.) There are no factual allegations, however, demonstrating how these alleged "male students" were similarly situated to Plaintiffs or how the University treated the similarly situated male students favorably or even differently. Courts in this circuit have dismissed equal protection claims where allegations in the complaint evinced similar failings. *See Equity In Athletics, Inc. v. Dep't of Educ.,* 639 F.3d 91, 108 (4th Cir. 2011) (dismissing equal protection claim on the grounds that plaintiff did not plead "sufficient facts to show, plausibly, that JMU treated male athletes differently from female athletes."); *Hodge v. Coll. of S. Maryland,* 121 F. Supp. 3d 486, 501, 502 (D. Md. 2015) (dismissing equal protection claim against University where plaintiff offered only his "conclusory assertion that Mr. Hodge did not receive an equal education to that of his white peers"); *Byrge v. Virginia State Univ. Bd. of Visitors,* No. 3:13CV031-HEH, 2013 WL 2490183, at *5 (E.D. Va. June 10, 2013) (dismissing equal protection claim where plaintiff "pled no facts that identify any similarly situated employees at VSU, African–American or otherwise, that were treated differently as a result of discriminatory animus."); *Nofsinger v. Virginia Commonwealth Univ.,* No. 3:12-CV-236, 2012 WL 2878608, at *9 (E.D. Va. July 13, 2012) (stating Nofsinger "fails to plead any facts whatsoever, with respect to how the three to six students described in her Complaint were similarly situated to her." Dismissal of Count Three on these grounds is equally warranted here.

2.     **Plaintiffs do not plead Defendants were motivated by discriminatory animus.**

The crux of Plaintiffs claim is that Defendants "tolerated" and "encouraged" "gender discrimination against Plaintiffs." (Compl. ¶¶ 103-104.) Those allegations are insufficient as a matter of law. Plaintiffs must show that the University's and President Hurley's actions ***were motived by personal animus***. *See Nofsinger,* 2012 WL 2878608, at *9 (stating "[t]here are also no facts pled that would plausibly link Nofsinger's dismissal from the Program to any personal

animus or discrimination on the part of the individual Defendants."); *Clear Sky Car Wash, LLC v. City of Chesapeake*, *Va.,* 910 F. Supp. 2d 861, 887 (E.D. Va. 2012) (dismissing equal protection claim stating "There are no facts offered to plausibly establish that any defendant acted with discriminatory intent toward Plaintiffs.").

What is more, the allegations in the Complaint render implausible Plaintiffs' bare allegations that the University or President Hurley "tolerated" or "encouraged" others to discriminate against Plaintiffs. The University and President Hurley met with members of Feminists United on several occasions. (*See* Compl. ¶¶ 26, 41 and 49.) President Hurley stated in a meeting with Feminists United that he was disgusted by the rugby team chant and that action would be taken. (Id. ¶ 26.) And action was taken. The University held an open forum about sexual assault on campus. (Id. ¶ 35.) It sanctioned the rugby team. (Id. ¶ 36.) President Hurley sent an email to the student body discussing the University's efforts to end "sexual assault, violence against women, and other forms of discrimination and harassment that prevail in our society." (Id. ¶ 40.) He also sent an email to the student body explaining that the rugby team had been suspended indefinitely and each team member was required to go to sexual assault training. (Id. ¶ 43.) The University sent a campus-wide email advising students on how to respond to offensive comments on anonymous social media sites. (Id. ¶ 50.) President Hurley and others attended the Feminist United rally "End Campus Rape" to hear Plaintiff McKinsey speak. (Id. ¶ 56.) The University organized sharing circles where "Plaintiffs McKinsey and Michels and others met with University officials . . . to discuss . . . how disturbed they were by the offensive and threatening Yaks" and "to develop a set of proposals to address the Yik Yak threats." (Id. ¶¶ 62 and 63.)

Further, it is clear from the Complaint that the reason the University did not disable and ban the Yik Yak application was due to the University's concern about potential First Amendment violations, not a desire to encourage or tolerate the sexual harassment of Plaintiffs. (*See* id. ¶¶ 54, 59 & 61.)  The University's concerns were explained to the Plaintiffs on several occasions by President Hurley and other University officials.  (*See* id. ¶¶ 54, 58, 59 and 61.) Plaintiffs have failed to demonstrate that either the University's or President Hurley's actions or inaction were motivated by a desire to harass or discriminate against Plaintiffs.  Accordingly, Count Three's equal protection claim cannot stand.

**G.    ANY CLAIM FOR DAMAGES UNDER COUNT THREE SHOULD BE DISMISSED UNDER RULE 12(B)(6) AS PRESIDENT HURLEY IS ENTITLED TO QUALIFIED IMMUNITY**

Even if Plaintiffs have alleged a viable equal protection claim under 42 U.S.C. § 1983 (and they have not), President Hurley is immune from any damages liability under the doctrine of qualified immunity.  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  The Fourth Circuit determines the availability of immunity by performing a three-step test.  *See Gould v. Davis*, 165 F.3d 265, 269 (4th Cir. 1998).  It first identifies the right allegedly violated.  "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case.'"  *Scott v. Harris*, 550 U.S. 372, 376 (2007) (quoted case omitted).  And finally, it determines whether a reasonable person in the official's position could have known that his conduct violated that right. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).  In order for a right to be clearly established, "every reasonable official" who transgresses the right "must have understood that what he is doing violates that

right." *Tanyi v. Appalachian State Univ.*, No. 5:14-CV-170RLV, 2015 WL 4478853, at *9 (W.D.N.C. July 22, 2015) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).  Based on those standards, President Hurley is entitled to qualified immunity.

Plaintiffs' contention appears to be that the University's failure to block the Yik Yak application on campus or advise the student body that Feminists United had no role in the rugby team's punishment violated Plaintiffs' rights to equal protection.  (Compl.  ¶ 49.)  Since it does not appear that any federal court has directly addressed these issues in the specific context of this case, it is not clearly established that the University's failure to take these actions violated Plaintiffs' rights to equal protection.

President Hurley believed, however, that the University was restricted by the First Amendment, which was a reasonable belief.  (Id. ¶ 58.); *see also Mainstream Loudoun v. Bd. of Trustees of Loudoun County. Library*, 24 F. Supp. 2d 552, 570 (E.D. Va. 1998) (ruling that "Although defendant is under no obligation to provide Internet access to its patrons, it has chosen to do so and is therefore restricted by the First Amendment in the limitations it is allowed to place on patron access.").  Under First Amendment case law, speech relating to matters of "political, social, or other concern to the community" deals with matters of public concern.  *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011). "Speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).  It is protected speech under the First Amendment.  *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972) (stating "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.") (internal citations and quoted case omitted).

The speech about which Plaintiffs complain involves a public concern. The posts expressed views regarding the social and political treatment of women on campus that were contrary to those of Feminists United members. (Compl. ¶¶ 21, 28 and 48.) Thus, such speech was entitled to special protection. And it certainly is not clearly established law that the University can restrict student access to a social media application on the grounds that the University disagrees with the views expressed on it. *See c.f., Mainstream Loudoun*, 24 F. Supp. 2d at 570 (E.D. Va. 1998) (holding county library's policy of blocking sexually explicit websites from its internet in an effort to prevent a sexually hostile work environment was an unconstitutional content-based restriction on free speech and an unconstitutional prior restraint.).

Thus, in light of legal authorities suggesting that University action to block the use of Yik Yak might run afoul of the First Amendment and the absence of a consensus of cases clearly establishing Plaintiffs' right to have the University do so, it cannot be said that President Hurley was on notice that his actions or inaction would violate Plaintiffs' right to equal protection. *See Rogers v. Pendleton*, 249 F.3d 279, 287–88 (4th Cir. 2001) (stating that in determining the proper application of qualified immunity courts may "rely upon cases of controlling authority in the jurisdiction in question, or a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'") (quoted case omitted). Neither was it clearly established that the Defendants' failure to advise the student body that Feminists United members had no role in the rugby team's punishment violated their rights to equal protection. Accordingly, President Hurley is entitled to qualified immunity to the extent Count Three seeks damages as relief.

## H. PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF FAILS UNDER RULE 12(B)(6)

To obtain injunctive relief, a plaintiff must show: (1) irreparable injury, (2) that remedies at law "are inadequate to compensate for that injury"; (3) that "the balance of hardships between

the plaintiff and defendant" warrants a remedy; and (4) that an injunction would not disserve the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). Furthermore, a plaintiff must demonstrate a "real or immediate threat that the plaintiff will be wronged again" or "a likelihood of substantial and immediate irreparable injury." *Simmons*, 47 F.3d at 1382 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Plaintiffs have not alleged any facts to meet any of those requirements. They offer only a bare assertion that they are entitled to injunctive. Indeed, the students Plaintiffs do not allege they are still students at the University; when students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate. *See, e.g.*, *Mellon v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003). In sum, no basis exists for this Court to award the Plaintiffs the extreme remedy of injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss this matter pursuant to Rules 12(b)(1) and 12(b)(6) with prejudice.

Respectfully submitted,

/s/ Rita P. Davis
Rita P. Davis (VSB #45675)
Senior Assistant Attorney General/
Trial Section Chief
John G. Butler, III (VSB #46200)
Assistant Attorney General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-6549
Facsimile: (804) 371-2087
Email: rpdavis@oag.state.va.us
*Counsel for Defendants*

Mark R. Herring
Attorney General of Virginia

Samuel T. Towell
Deputy Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of May, 2017, I filed a copy of the foregoing document using the Court's ECM/ECF filing system, which will send an electronic notification of the same (NEF) to counsel of record for the Plaintiffs.

/s/ Rita P. Davis
Rita P. Davis (VSB #45675)
Senior Assistant Attorney General/
Trial Section Chief
John G. Butler, III (VSB #46200)
Assistant Attorney General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 786-6549
Facsimile: (804) 371-2087
Email: rpdavis@oag.state.va.us
*Counsel for Defendants*